# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

TEREASA HOVENGA,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

No. C09-3075-PAZ

**MEMORANDUM OPINION AND
ORDER**

---

    This matter is before the court for judicial review of the defendant's decision denying the plaintiff's applications for disability insurance ("DI") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*

    On July 28, 2006, the plaintiff Tereasa Hovenga filed applications for DI and SSI benefits alleging she has been disabled since June 21, 2004.[1] Her applications were denied initially and on reconsideration. A hearing was held before an Administrative Law Judge ("ALJ") on December 23, 2008. On January 30, 2009, the ALJ issued her decision, ruling that Hovenga was not disabled, and therefore was not entitled to benefits. On September 23, 2009, the Appeals Council denied Hovenga's request for review, making the ALJ's decision the final decision of the Commissioner.

    Hovenga filed a timely Complaint in this court seeking judicial review of the ALJ's ruling. She claims she suffers from three distinct disorders, which together prevent her from engaging in substantial gainful employment: "(1) severe coronary artery disease, which has resulted in chronic chest pain; (2) severe degenerative disc disease, which has

---

[1]Her date last insured was September 30, 2008.

resulted in chronic lower back pain; and (3) a serious mood disorder, which symptoms include significant depression and anxiety." Doc. No. 10, at 2. She argues the Commissioner erred in not properly evaluating her subjective allegations about the extent of her pain and fatigue; not giving sufficient weight to the opinions of her treating medical providers; posing incomplete hypothetical questions to the vocational expert; concluding she was not disabled despite finding that she was restricted to a range of sedentary work that was significantly eroded; and because the overwhelming evidence supports a finding of disability. She asks that the court reverse the decision of the ALJ and remand for computation of benefits. Alternatively, she asks that her case be remanded to allow the Commissioner to correct the errors that occurred in her case.

On December 21, 2009, with the parties' consent, Judge Donald E. O'Brien transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The court must decide whether the ALJ applied the correct legal standards, and whether her factual findings are supported by substantial evidence based on a review of the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court will consider the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006).

At the ALJ hearing, Hovenga testified she was forty years old, 5'3" inches tall, and weighed about 126 pounds. She was separated from her husband, and lived with her brother-in-law, an eighteen-year-old son, and a disabled twenty-year-old son. Her only source of income was child support.

Hovenga has an unrestricted driver's license, and drives about twenty miles a week, but a friend drove her to the hearing. She completed the eighth grade. She did not obtain

a GED because of an "attention deficiency" that kept her from completing a required essay. She has some vocational training, and was certified as a nurse's aide in 1984 or 1985. She has limited reading and writing skills, but she can read a newspaper and subtract to make change. She can pay her bills, but does a poor job with this task. At the time of the ALJ hearing, she was on notice that her water and electric services were being turned off for nonpayment.

From 2003 to September 2006, Hovenga worked from ten to twenty hours a week at AmeriHost Inn as a housekeeper. On June 21, 2004, after a five-year history of chest pains, Hovenga went to the hospital for tests. During the tests, she testified she "died on the table." Emergency heart bypass surgery was performed, and she recovered. After she was released from the hospital, she returned to work at AmeriHost, where special accommodations were made so she could continue working. These accommodations included reducing her work hours, assigning her only to first-floor rooms to clean, and not requiring her to lift heavy baskets. She quit her job when AmeriHost increased her workload. Before working at AmeriHost, she had worked for five years, about twenty-four hours a week, at a company baking cookies. She lost that job when the company moved away. Before that, she had worked off and on as a nurse's aide, working about thirty hours a week. She testified that as of the date of the ALJ hearing, she could not do any of her past jobs because of severe back and chest pains.

Hovenga testified she has "never been able to work a full time job." R. 23. The ALJ asked Hovenga if she would be able to work at a job where she could sit for most of the day, and she responded that she could not. She stated, "It's mainly my back. I have to sit for a little while. Then I have to stand. Sometimes walk around in the same area for a minute or so." R. 25. She testified that after sitting for fifteen to twenty minutes, she has to stand up. She can stand or walk for up to a half hour before she has to sit. She is unable to perform any activity for longer than fifteen minutes without getting tired and

having back pain, chest pain, and difficulty breathing. When she lifts her arms, she becomes numb in her arms, hands, and fingers. She can only lift things that weigh less than ten pounds. She has difficulty climbing stairs because of shortness of breath and pain in her back and leg. At the time of the hearing, Hovenga was experiencing pain in her lower back, going down her buttocks into her right leg. She also had numbness on the side of her right leg and down onto the top of her foot. The pain in her right leg and foot had been off and on, but for the two or three months before the hearing, it had been continuous. "It's like a stabbing. Sometimes it's just aching." R. 26. She testified that the pain is precipitated by bending and other activity.

A heating pad helps. She also takes Meloxicam, a non-steroidal anti-inflammatory medication prescribed for arthritis, every morning, and up to three hydrocodone tablets a day. The Meloxicam does not help her back pain, although it does help with arthritis she has in her hands. She has no side effects from the medicine. She testified that the hydrocodone is "pretty effective" with the pain, but it makes her drowsy and can make her nauseous. She attempts to relieve the pain with back rubs by her son and by using Icy Hot. She tried physical therapy three or four times, and it relieved her pain for up to a month, but the pain returned each time. She has a TENS unit, but it "doesn't seem to help." R. 28. At the time of the hearing, she was scheduled for some type of shot in her spine. She has been told by a physician's assistant that she is not a candidate for back surgery because of her heart condition.

Hovenga testified she has chest pains every day, at least three times a day. They started about a year after her bypass surgery. She takes nitroglycerine for this, and "[i]t's pretty effective," although it makes her feel lightheaded. R. 29. When the ALJ asked if she had talked to a doctor about her chest pains, she responded that she had a "major problem" with her cardiologist because she had overheard him saying "very rude things," and he had lied to her and her family. R. 30.

She testified she sometimes suffers from depression. She has seen several psychologists and psychiatrists for this problem. At the time of the hearing, she was taking Pristiq, an antidepressant, that was effective and had no side effects. R. 25-27. She also has problems with her memory. Also, when she is around other people, she is bitter, angry, and nervous, although she has not had problems with coworkers or supervisors. R. 27.

On a typical day, she spends her time watching movies on the television. She has trouble concentrating, but is able to follow about seventy percent of what she is watching because she only watches movies she has seen before. Once in awhile, she will get up, do some dishes or some laundry, and then sit down again. Later, she will get up and do some more dishes or laundry. She cannot make her bed without stopping because she becomes short of breath. Because of back pain, she is only able to bathe and wash her hair every four or five days. She seldom drinks. She last used illegal drugs ten to twelve years earlier. Neither alcohol nor drug usage affected her attendance or performance at work.

## *Medical Records of Coronary Artery Disease*

On June 21, 2004, Hovenga was admitted to the hospital complaining of chest pains. On admittance, she stated she had been having chest pains for eight years, but she was not aware of any serious heart problems. A cardiac catheterization procedure was performed which showed she was suffering from an occluded right coronary artery and "very tight left main coronary artery disease." R. 243. During the procedure, she experienced cardiac arrest, with multiple episodes of tachycardia. An emergency procedure was preformed, which involved the placement of an intra-aortic balloon pump and a stent in her left coronary artery. After she was stabilized, Dr. Christopher Nichols, M.D. performed high-risk coronary artery bypass grafting surgery, with four grafts. The surgery required a sternotomy, and then the insertion of some wires in her sternum. On June 27, 2004,

after several days of intensive care, she was discharged.  On August 13, 2004, she saw Dr. Nichols and reported that she had no chest pain.  An echocardiogram performed in October 2004, was normal.

In late July 2005, Hovenga complained to Dr. K. Mohan Pamulapati, her treating physician, of chest discomfort.  An exercise stress cardiolite test was administered by Dr. Mohan Brar on August 4, 2005.  Dr. Brar observed that during the test, Hovenga demonstrated an "excellent exercise capacity," with no chest discomfort, and the results of the testing were normal.  The findings of a myocardial perfusion imaging study were as follows:

> Myocardial perfusion imaging study revealed a small fixed inferior wall defect suggestive of previous myocardial infarction.  There is no area of any ischemia.  Upon review of gaited SPECT she has mild inferior wall hypokinesis especially in the basilar region.  Her LVEF is normal with LVEF of 64%.

R. 337.  Dr. Brar concluded from this testing that Hovenga "should be at overall low risk of adverse coronary event."  *Id.*  In December 2005, she saw Physician's Assistant Matt Sowle complaining of chest pain.

On February 1, 2006, Hovenga went to the emergency room complaining of severe substernal chest pain radiating down her left arm.  She was put on IV heparin, which relieved her pain.  She saw Dr. Pamulapati the next day, and he noted Hovenga's history of coronary disease, and that she had presented repeatedly with chest pain.  He also noted that she suffered from occasional acid regurgitation and chronic back pain, and she recently had dislocated her right shoulder while wrestling with her son.  She smoked, although she knew she should quit with her history of heart problems.  The doctor ordered a left heart catheterization, which showed Hovenga's heart was receiving normal blood flow, although one of the grafts was occluded.

On August 9, 2006, Hovenga saw Dr. E. Anthony Otoadese, a thoracic surgeon, complaining of chest pain. On September 11, 2006, Hovenga saw Dr. Otoadese for a followup. He noted she was complaining of weakness and achiness in both upper extremities, especially when she elevated her arms. He suspected thoracic outlet syndrome. He recommended that Hovenga's condition be followed closely because of this. Hovenga also complained of pain in both calves and hips when she walked, which possibly indicated peripheral vascular disease.

On September 13, 2006, Dr. Laura Griffith completed a physical residual functional capacity assessment for Disability Determination Services. Dr. Griffith concluded that Hovenga could lift twenty pounds occasionally and ten pounds frequently; sit, stand, or walk, with normal breaks, for six hours in an eight-hour workday; and push and/or pull without restriction. She supported these conclusions based on recent MRIs and x-rays, and on the fact that Hovenga's coronary grafts were patent. She opined Hovenga could never engage in activities requiring balancing, but she could engage in activities requiring occasional climbing, stooping, kneeling, crouching, and crawling. Dr. Griffith commented on her findings as follows:

> In 8/05 her LVEF was noted to be 64%. She had continued to have intermittent atypical chest pain. A repeat catheterization in 2/06 showed that her grafts were patent. In 4/06 her cardiopulmonary exam was normal. Claimant has a history of low back pain. Though care for this complaint has been limited. A lumbar spine x-ray in 6/06 showed mild DDD. An MDI showed a mild disc protrusion with minimal compression of the left S1 nerve root.

R. 429.

On December 7, 2006, Hovenga went to the emergency room because of chest pain "which had spontaneously resolved." R. 459. She was examined by Dr. Todd K. Lawrence, who spent "a great deal of time" trying to convince her to stay in the hospital

for a coronary evaluation, but she refused and went home. R. 460. On December 12, 2006, she called Dr. Otoadese's office to complain of "a lot of chest pain." R. 465.

On January 11, 2007, Dr. Pamulapati performed a left heart catheterization and a coronary angiogram. The right coronary artery, left internal mammary artery to left anterior descending, and saphenous vein graft to marginal, all were found to be completely occluded. Her left main artery had a stent that had thirty to forty percent diffuse stenosis, and the proximal circumflex had a sixty to seventy percent stenosis and was occluded in the obtuse marginal one area. Dr. Pamulapati noted that Hovenga's problems were "progressing rapidly," and could result in a heart attack. R. 511-513.

On February 15, 2007, Dr. Mary Greenfield performed a "Case Analysis" of Hovenga's medical records. She concluded as follows:

> Claimant is a 39 year old female who alleges disability on the basis of heart, back, leg, and memory. As reconsideration, claimant alleges more back pain and a big change in holding arms up or using them in daily activities. Updated evidence in file includes visits at which claimant reported claudication type symptoms but bilateral ABIs were essentially normal. Additionally, claimant was seen for CP that spontaneously resolved; she again reported CP in the ER and was treated but then left AMA, eroding the credibility of allegations. Claimant has also been seen for chronic low back pain and this was addressed at the initial level. Reporting of chest pain was noted to be somewhat inconsistent and claimant's allegations of functional limitations to DDS aren't fully supported in the MER. All of the evidence has been reviewed and additional limitations aren't warranted.

R. 516.

Dr. Cary Rose saw Hovenga on February 5, 2008. Notes indicate Hovenga continued to complain of chest pain. She told the doctor that certain of her medications caused her to have chest pain. Dr. Rose noted, "I believe that there are very real cardiac issues at work here but I believe the patient is suffering from an extreme amount of

psychological problems." The doctor also noted that Hovenga continued to smoke cigarettes despite her condition. R. 626.

On March 1, 2008, Hovenga again saw Dr. Rose. The doctor's notes indicate Hovenga had undergone another heart catheterization procedure three weeks earlier which showed that she had lost two of her four grafts. Her cardiac status was stable, and she had done well after her most recent catheterization procedure. Notes indicate she "had essentially no chest pain, she ha[d] stopped smoking, and she look[ed] terrific." R. 628-30. However, Dr. Rose opined that the severity of her heart disease might dictate that in a couple of years, Hovenga would have to be evaluated for a heart transplant.

### *Medical Records of Degenerative Disc Disease.*

On May 20, 2002, Hovenga was evaluated by Dr. Roger L. Skierka for chronic low back pain. On September 15, 2003, an MRI of her lower spine revealed "a degenerative disc disease with circumferential disc bulge at L5-S1." R. 395. On May 19, 2006, an MRI showed a "[s]table L5-S1 mild disc protrusion, slightly asymmetrical to the left causing minimal compression of the left S1 nerve root." R. 350. X-rays taken on January 23, 2008, showed "severe degenerative disk disease of L5-S1 which appears to have progressed when compared with 6/16/2006." R. 593. An MRI on November 21, 2008, showed "severe degenerative disc disease of L5-S1," with "bulging of the residual disc." R. 675.

For several years, Hovenga saw P.A. Sowle for complaints of low back pain. The first record in Sowle's notes of these complaints is from an examination on December 7, 2006, where he noted that Hovenga was complaining of chronic low back pain. R. 495. This notation was repeated in Sowle's notes of examinations on January 23, 2007 (R. 545); February 23, 2007 (R. 544); April 12, 2007 (R. 542); May 14, 2007 (R. 540); June 25, 2007 (R. 638); July 20, 2007 (R. 537); February 28, 2008 (R. 652); March 26, 2008

(R. 651); April 21, 2008 (R. 650); May 19, 2008 (R. 649); June 19, 2008 (R. 648); July 23, 2008 (R. 646); October 10, 2008 (R. 643); November 20, 2008 (R. 686); and November 24, 2008 (R. 680).[2]  In his notes of the July 23, 2008, visit, Sowle noted that Vicodin seemed to keep Hovenga's back pain "under control."  In his notes, Sowle expressed the opinion that Hovenga was not a candidate for back surgery because of her cardiovascular problems.  R. 400, 544.

On January 15, 2008, Hovenga saw Dr. Claro T. Palma, a rheumatologist, for a fibromyalgia evaluation.  Part of Dr. Palma's "working diagnosis" was " degenerative disc disease of the cervical and lumbar spine."  R. 522; *see* R. 536.  It does not appear that Dr. Palma ever actually assessed Hovenga's complaints of back pain.

On March 26, 2008, Sowle completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)."  R. 617-620.  He opined that Hovenga could lift less than ten pounds, stand or walk for less than two hours in an eight-hour workday, and sit for less than six hours in an eight-hour workday.  From these limitations, Sowle concluded Hovenga was severely limited in her ability to function by pain/fatigue, and she would not be able to sustain a six- to eight-hour workday, five days a week.

On November 21, 2008, Dr. Dan Mulholland performed an MRI of Hovenga's lower spine.  He found she suffered from "severe degenerative disc disease of L5-S1," with "bulging of the residual disc."  R. 675.  X-rays taken at the same time were consistent with this finding.

After the ALJ decision, Hovenga's representative submitted to the Appeals Council a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form prepared by Dr. Lee Fagre on April 22, 2009.  Doc. No. 10-1, at 3-6.  Dr. Fagre concluded Hovenga is impaired in her ability to lift and carry to the extent that she could

---

[2]However, Sowle performed a comprehensive physical examination of Hovenga on December 27, 2007, and made no notation regarding back pain.  R. 491-92.

only occasionally lift or carry items weighing less than ten pounds; she can stand and/or walk less than two hours in an eight-hour workday; she can sit, but she must alternate sitting and standing periodically to relieve pain or discomfort; and her ability to push and pull is limited in both her upper and lower extremities. He further concluded she should never engage in activities requiring climbing, balancing, kneeling, crouching, crawling, or stooping. She also is limited in reaching, and because of memory loss, in speaking. Dr. Fagre stated that his conclusions are supported by medical findings relating to Hovenga's heart, coronary artery bypass grafts, degenerative back disease, and peripheral vascular disease. He also concluded that her fatigue/pain is severe, and she is unable to sustain a six to eight-hour workday because of the pain and fatigue.

### *Medical Records of Depression and Mood Disorder.*

A report of an MRI taken on June 27, 2006, indicates that Hovenga was complaining of memory loss. R. 484. In the MRI report, the doctor indicated that her brain was "within normal limits." The record reflects, however, that over the years, Hovenga frequently complained to her treating medical sources of depression and other psychological problems.

On October 2, 2006, David P. Johnson, Ph.D., a licensed psychologist, evaluated Hovenga and prepared a report for Disability Determination Services. DDS had asked for an assessment of Hovenga's "current level of memory functioning and for a mental status examination done in conjunction with other psychological testing." Dr. Johnson determined that Hovenga was functioning in the average to high-average range of general memory functioning. He concluded that her memory function was "relatively intact." He stated it was "likely that any difficulties with attention, concentration, or distractibility which she might display are the result of emotional and personality factors, instead of significant organic brain damage as such." He also stated, "Her mental and emotional

status is consistent with diagnoses of a mood disorder resulting from her physical condition with depressive features, a depressive disorder not otherwise specified, and an adjustment disorder with mixed anxiety and depressed mood. There is also a need to rule out the presence of a persistent low-grade depressive disorder or dysthymia. She also evidences some avoidant personality traits." R. 433. He estimated Hovenga's GAF to be 45, with a high GAF within the past year of 50. He concluded with the following:

> Mrs. Hovenga would appear able to remember and understand simple instructions, procedures, and locations. She would appear to be only mildly limited in her ability to remember and to understand more detailed or complex instructions, procedures, and locations, and in her ability to maintain attention, concentration, and pace on the job. She would appear to be mildly to moderately limited, for reasons of her emotional and personality functioning, in her ability to carry out instructions, to interact appropriately with supervisors, co-workers, and the public, and in her ability to use good judgment and respond appropriately to changes in the work place.

R. 434.

Dr. David Smith, a psychologist, completed a "request for medical advice" form for Hovenga on October 19, 2006. He reviewed the report of Dr. Johnson, and reached the same conclusions.

On October 30, 2006, Rhonda Lovell, Ph.D. reviewed the record and completed a psychiatric review technique form regarding Hovenga. She concluded as follows:

> This is a concurrent DI/DIB claim by a 39 year old woman alleging disability due to leg, back, heart, and memory problems. The AOD is 6/21/04 with a filing date of 7/21/06. The MDIs are Mood Disorder resulting from physical condition with depressive features, Depressive Disorder NOS, Adjustment Disorder with mixed anxiety and depressed mood, rule out Dysthymia, and Avoidant Personality Traits.

> The claimant's allegations are partially supported by the medical record with no particular credibility concerns

identified. The claimant has some history of hypoxia during surgery. An MRI revealed minimal white matter tract microvascular ischemic changes. The claimant has some history of treatment for depression and anxiety with no psychiatric hospitalizations. At CE on 10/2/06, the claimant's memory functioning was in the Average to High Average range and no evidence of significant organic dysfunction was discovered. The claimant continued to work as a motel housekeeper part-time through 9/06. Current ADLs include some cleaning, laundry, driving, shopping, and money management. The claimant cares for teenage children and grandchildren. She denied difficulties getting along with authority figures and has never been fired due to difficulties interacting with coworkers.

The claimant's mental impairments appear to be nonsevere. Based on ADLs, work history and formal testing, the claimant is able to understand and remember instructions and procedures for basic and detailed tasks. Concentration is sufficient to carry out tasks, according to formal testing and ADLs. The claimant's work history and ADLs indicate that she is able to interact appropriately with others. Treatment records, work history and ADLs show that she would be able to regularly complete a typical work week when she wishes to do so. This assessment is consistent with the overall record. No treating source statement was offered.

R. 449.

On January 10, 2007, Hovenga was evaluated for complaints of depression and anxiety by Dr. Asad Khan Suri, a psychiatrist. Dr. Suri reached the following conclusions:

She is a middle-aged female, depressed, disheveled appeared, restricted affect. Good eye contact. There is no psychomotor agitation or retardation. Her speech is soft and spontaneous. Her thought processes are logical and coherent. Her though[t] content is depressed but not suicidal. Her intellect is normal. Her abstraction is fair. Her memory is intact. There are no

> delusions.  There are no hallucinations.  Her insight and
> judgment into her illness is rated fair.

R. 510.  His diagnosis was mood disorder, NOS; rule out bipolar disorder; rule out panic disorder with agoraphobia.  He estimated her GAF as 50/55.

In the notes of his examination on February 5, 2008, Dr. Rose noted that Hovenga "is suffering from an extreme amount of psychological problems."  R. 626.  Hovenga also complained about symptoms of depression or anxiety to P.A. Sowle on numerous occasions, including on February 7 and October 10, 2008.


### *Vocational Expert's Testimony*

A vocational expert ("VE") testified at the ALJ hearing.  The ALJ asked the VE the following hypothetical question:

> A person could do light work as defined in Social Security
> regulations and the Dictionary of Occupational Titles,
> however, the person should never climb ropes, ladders,
> scaffolds, only occasionally climb ramps or stairs, occasionally
> balance, stoop, kneel, crouch, or crawl. . . .  Taking into
> account a person the same age, education, and with no past
> relevant work similar to the claimant, that would be a younger
> individual with a limited education and no past relevant work
> and given these limitations, would there be any jobs available
> in the national economy?

R. 43.  The VE responded that the hypothetical individual would be able to perform some light, unskilled jobs, such as assembler, small products; production worker; marker; stock clerk and order filler; and sales attendant.

The ALJ then asked the VE a second hypothetical question:

> [T]ake the limitations in hypothetical number one and add that
> the person should avoid concentrated exposure to hazards and
> can do only simple, routine, repetitive work.  I'm placing
> those limitations because of pain.  There's no [INAUDIBLE].
> I don't find that the mental is severe.  I think given the

> testimony that the medication helps with that. Given that and of course there's no past relevant work, given that can you, and assume also the same profile, age, education, and no past relevant work, can you identify any jobs that could be performed as such an individual under hypothetical number two?

R. 44. The VE responded that the hypothetical individual would be able to perform the same jobs as would the person in hypothetical number one.

The ALJ then asked a third hypothetical question:

> A person can do sedentary work as defined in Social Security regulations and the Dictionary of Occupational Titles. Never climb ramps, excuse me, never climb ropes, ladders, scaffolds. Occasionally climb ramps or stairs, occasionally balance, stoop, kneel, crouch, crawl. Okay. Given that and the same profile as earlier, age, education, and no past relevant work, can you identify any jobs in the national economy?

R. 44-45. The VE responded that the hypothetical individual would be limited to sedentary, unskilled jobs, such as addresser, final assembler, and charge account clerk.

The ALJ then asked a fourth hypothetical question:

> Hypothetical number four, let me build on hypothetical number three. So we're still at sedentary with the same postural limitations. Add that the person should avoid concentrated exposure to hazards and can do only simple routine repetitive work. Given that, how does that affect or are there any jobs available in the national economy?

R. 45. The VE responded that the hypothetical individual would be able to do the same jobs as would the person in hypothetical number three.

The ALJ then asked a fifth hypothetical question and the following colloquy ensued:

> Q    Now, I'm going to take hypothetical four, the sedentary with the additional postural and no concentrated exposure to hazards, only simple, routine, repetitive work and add to that rarely

push/pull with the upper extremities. That would be operation, for example, operation of hand controls. And rarely reaching with the upper extremities in front and overhead. Well, maybe I should just say reaching period.

A    No reaching?

Q    Rarely, which probably gets –

A    Okay.

Q    – translated into no.

A    Okay.

Q    I'm just, I don't know for sure because rarely reaching, it would be much less than a third of the day. And that would be bilaterally, the upper extremities bilaterally for both of these. Given that, well, there is no past relevant work. A person with the same age and educational background, would there be any jobs available?

A    If the person, let's say if this is hypothetical four, which is no five, and we're taking the sedentary –

Q    Right.

A    – and rarely reaching, can the person handle, finger, feel? Is there any restriction on that?

Q    They can handle, finger, and touch.

A    And that was frequent?

Q    At least frequently, yes.

A    Frequent, okay.

Q    Actually, I'm not placing a restriction so I guess constantly.

R. 47-48. The VE responded that "according to the DOT," the hypothetical individual would be precluded from performing the addresser, final assembler, and charge account

clerk jobs, but in the opinion of the VE, the hypothetical individual could perform most of these jobs because they can be performed "at waist level."

The ALJ then asked a sixth hypothetical question:

> If the person [in the fifth hypothetical question] were to [sit] primarily on the job but would need to get up every 20 minutes for a brief time and then could resume sitting.

R. 49-50. The VE responded that the same jobs still would be available.

Hovenga's attorney asked the VE to add the following restrictions to the person described in the ALJ's last hypothetical question: "[D]ue to chest pain, shortness of breath, and fatigue, if this person required two to three more breaks [than] what are normally allowed . . ., would that person be able to do the jobs you've listed?" R. 50-51. The VE responded that the additional breaks would preclude all competitive employment.

### *The ALJ's Decision*

In her decision, the ALJ found that Hovenga has not engaged in substantial gainful activity since June 21, 2004, her alleged disability onset date. She found that Hovenga has the following severe impairments: coronary artery disease, status post coronary artery bypass grafting and catheterization; degenerative disc disease; hypertension; and osteo-arthritis of the S1 joints. The ALJ found that Hovenga's mental impairments of mood disorder, depressive disorder, adjustment disorder, and history of alcohol and substance abuse, considered singly or in combination, are nonsevere. She also found that none of Hovenga's impairments, singly or in combination, meet the requirements of the Listings.

The ALJ stated she had considered the entire record carefully, and she had concluded that Hovenga has the residual functional capacity to perform sedentary work, except she can never climb ropes, ladders, or scaffolds; she can only occasionally climb ramps or stairs; and she can only occasionally balance, stoop, kneel, crouch, or crawl. Also, she must have a sit/stand option every thirty minutes, and she should avoid

concentrated exposure to hazards. Further, she can rarely push or pull with her upper extremities, which includes the operation of hand controls. She can rarely reach bilaterally with her upper extremities. Moreover, due to pain from the physical impairments, she can only do simple, routine, repetitive work.

The ALJ gave only "some" evidentiary weight to the opinions of Dr. Otoadese. However, she gave "great weight" to the opinions of Dr. Griffith, a non-examining physician who reviewed Hovenga's records for DDS, because of Dr. Griffith's "clinical findings and reasoned bases for her decisions, which she based on review of all the medical evidence of record to date." R. 66. For the same reasons, she also gave great weight to the opinions of Dr. Greenfield, another non-examining physician who reviewed Hovenga's medical records. She gave "significant weight" to the opinions of Dr. Johnson, Dr. Suri, and Dr. Mulholland, and to " the contemporaneous, longitudinal medical treatment records and to the diagnoses supported by medically acceptable clinical and laboratory techniques." R. 66-68. She found that most of the opinions of treating P.A. Sowle were not supported by acceptable medical techniques. She gave some weight to his opinions as to the severity of Hovenga's impairments and her ability to function, but no weight to those opinions to the extent they were "unsupported by the medical evidence in the record." R. 69.

The ALJ found that Hovenga's medically-determinable impairments reasonably could be expected to cause her alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the ALJ's RFC findings. She noted that Hovenga described daily activities which are fairly limited, but found that two factors weighed against her testimony. First, the limited nature of the daily activities "cannot be objectively verified." R. 69. Second, even if her daily activities are as limited as alleged, "it is difficult to attribute that degree of limitations to [her] medical condition, as opposed

to other reasons" because of the weak medical evidence. *Id*. The ALJ found that Hovenga's daily activities are not limited to the extent that would be expected of someone with her claimed limitations. She noted that Hovenga takes care of her children and does the laundry, albeit with limitations. She watches television, and she sits on the step or at a picnic table. She rides a bicycle, although she first takes pain pills. She has a driver's license, and drives to the grocery store and to appointments. She also has been able to wrestle with her son.

The ALJ also discounted Hovenga's claimed impairments because of her work history of extremely low earnings, with considerable fluctuation in wages from year to year, and her inconsistent statements regarding matters relevant to the issue of disability. She also had failed to follow up on recommendations by her treating doctors, suggesting her symptoms were not a serious as she claims.

The ALJ summarized as follows:

> In sum, the above residual functional capacity assessment is supported by the objective medical evidence contained in the record. Treatment notes in the record do not sustain the claimant's subjective allegations. To the extent the claimant experienced mental impairments, there were only mild limitations. The State Agency opinions are internally consistent and consistent with the evidence as a whole. The credibility of the claimant's allegations is weakened by evidence of diverse daily activities and inconsistences between the claimant's testimony and the medical records for the relevant period. The claimant did experience some level of limitations, but only to the extent described in the residual functional capacity.

R. 71.

Based on these findings, the ALJ ruled that Hovenga was able to perform the requirements of occupations such as addresser, final assembler, and charge account clerk.

R. 72.  The ALJ found, therefore, that Hovenga has not been under a disability, as defined by the Social Security Act, from June 21, 2004, to the date of the ALJ's decision.

## *Discussion*

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003).  "An impairment is not severe if it amounts only to a slight abnormality that would not

significantly limit the claimant's physical or mental ability to do basic work activities."

*Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the

physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th

Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *See Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)) *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at

1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

Hovenga first contends that the ALJ did not properly evaluate her subjective allegations about the extent of her pain and fatigue. Doc. No. 10, at 17. She points out that the ALJ gave three reasons for finding her statements about the severity of her symptoms not to be credible: (1) her reported daily activities were inconsistent with her complaints of disabling symptoms; (2) she failed to follow up on the recommendations made by various treating doctors; and (3) she had extremely low earnings throughout her life, with considerable fluctuation in wages from year to year.

Hovenga argues the ALJ failed to explain how her activities are inconsistent with her allegations of disabling pain. The ALJ summarized Hovenga's activities as follows:

> Both the claimant as well as her son reported the claimant takes care of her children and does their laundry, albeit she testified to limitations in doing so. The claimant stated she spends time watching television, sitting on the step, or sitting at the picnic table. In addition, the claimant's brother reported the claimant enjoyed watching television. The claimant reported she might go for a bike ride after taking pain pills. The claimant does have a driver's license and drives to the grocery store or to appointments. The claimant has also been able to wrestle with her son.

R. 70. Hovenga argues some of these statements are misleading, and others are not inconsistent with her allegations of disability. She points out the source of the ALJ's statement that Hovenga "takes care of her children" *and* does their laundry is from two forms, one signed by Hovenga and the other signed by her eighteen-year-old son, on which they both state she does laundry for her two sons. R. 161, 173. Nothing on the forms suggests that she does anything else to "take care" of her children, both of whom are grown and presumably would require little additional care.[3]

---

[3]One of Hovenga's sons is disabled, but nothing in the record reflects the nature or extent of the disability.

The court agrees that based on the record, the ALJ overstated the extent of this activity. Furthermore, Hovenga's other activities are not inconsistent with her complaints of pain and disability. "[A]n SSI claimant need not prove that she is bedridden or completely helpless to be found disabled and the fact that claimant cooks and cleans for herself, shops for groceries, does laundry, visits friends, attends church, and goes fishing does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity." *Cline v. Sullivan*, 939 F.2d 560, 566 (8th Cir. 1991) (citing *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)). The fact that on one occasion in January 2006, Hovenga apparently hurt herself while wrestling with her son does not, by itself, detract from the credibility of her claims, particularly where the record does not contain any details of the incident to put it into context.

Hovenga also takes issue with the ALJ's finding that her credibility is weakened by her failure to "follow up on recommendations made by various treating doctors." R. 70-71. The first example cited by the ALJ is Hovenga's refusal to remain in the hospital on December 7, 2006, against the advice of Dr. Lawrence, the emergency room doctor, that she remain for coronary evaluation. This incident has little or nothing to do with Hovenga's credibility. On that day, she went to the hospital because of chest pain, but the pain resolved spontaneously. She was no longer in distress when Dr. Lawrence saw her. Less than a week later, when the pain returned, she called her personal doctor to report her symptoms, and within a month, she saw her cardiologist, who performed a left heart catheterization and coronary angiogram. This incident is not similar to cases where a claimant has simply refused or failed to seek appropriate medical treatment. *See*, e.g., *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (claimant failed to seek regular, frequent medical treatment, and failed to follow recommended treatment even though evidence indicated compliance with treatment and medications was effective in controlling

severe symptoms); *Edwards v. Barnhart*, 314 F.3d 964, 967-68 (8th Cir. 2003) (claimant's failure to seek regular medical care undermined her credibility) (citing *Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996), for the proposition that "[a]n ALJ may discount a claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment"). The record reflects that Hovenga diligently sought medical treatment for chest pain over an extended time period.

The ALJ also relied on the fact that one of Hovenga's doctors "did not feel" she was taking medicine prescribed to lower her cholesterol. R. 70. Such speculation has little, if any, probative value. The ALJ relied more heavily on Hovenga's repeated failures to quit smoking despite warnings as to how extraordinarily dangerous smoking was for someone with her history. While it is true Hovenga was warned several times that smoking represented a serious risk for someone with her cardiac problems, but she continued to smoke, it is difficult to see how this relates to credibility. Although it is unwise, if not foolhardy, for someone with serious cardiac disease to smoke cigarettes, the inability of that person to quit smoking is much more a reflection of the strength of an addiction to tobacco than on the credibility of the person's complaints. Further, the record establishes that she did, in fact, quit smoking in March 2008. However, under Eighth Circuit precedent, the ALJ was allowed to take this into account. The Eighth Circuit Court of Appeals has held the fact that a claimant continues to smoke despite being advised by a doctor to quit can properly be considered by the ALJ in discounting a claimant's subjective allegations. *See Strickland v. Barnhart*, 143 Fed. Appx. 726, 726 (8th Cir. 2005) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)); *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997); *see also Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (a failure to quit smoking when advised to do so by treating doctor may be grounds for denying an application for benefits); *but see O'Donnell v. Barnhart*, 318 F.3d 811, 819 (8th Cir. 2003) (failure to stop smoking does not show claimant's complaints are not

credible.); *Runkle v. Astrue*, 2008 WL 4447679 at *2 (C.D. Cal., Sept. 30, 2008) (people smoke cigarettes despite being aware of the dangers from smoking "because cigarette smoking is a very difficult habit to break."); *cf. Rousey v. Heckler*, 771 F.2d 1065, 1070 (7th Cir. 1985) ("None of the medical evidence linked her chest pain directly to the smoking of cigarettes and it was not proper for the ALJ to independently construct that link.").

The ALJ also found that Hovenga's work history detracted from her credibility:

> [A] review of the claimant's work history shows that the claimant has had extremely low earnings with considerable fluctuation in wages from year to year, during her entire life, which raises a question as to whether the claimant's continuing unemployment is actually due to her medical impairments.

R. 69. Hovenga argues the ALJ failed in her independent duty to develop the facts fully and fairly concerning Hovenga's prior work history because at the hearing, the ALJ failed to ask Hovenga to explain why she never held a full-time job. In her brief, Hovenga advances her prior history of chest pain and her psychological problems as explanations for the lack of full-time employment. This argument is unpersuasive. Nothing in the record suggests that Hovenga's ability to work before her heart attack on June 21, 2004, was limited by chest pains or psychological problems. While it was the ALJ's duty to develop the record fully and fairly, the relevant inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)). *See also Highfill v. Bowen*, 832 F.2d 112, 115 (8th Cir. 1987) (claimant must show prejudice or unfairness resulting from an incomplete record); *accord Anderson v. Chater*, 73 F.3d 366 (table), 1995 W.L. 763052 at *2 (8th Cir. 1995). There was no reason for the ALJ to suspect that Hovenga's ability to work prior to her heart attack was because of chest pains or psychological problems. The ALJ had no duty to speculate on these potential causes on her own. Hovenga had the opportunity to explain

her spotty work history prior to her heart attack, and did not do so. There is no showing here that the ALJ treated Hovenga unfairly in developing the record. Ultimately, it was Hovenga's burden to prove disability at step five of the sequential evaluation process. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

Finally, although not mentioned by the ALJ, it appears from the record that prescription medication provides Hovenga with significant relief from her back and chest pain. Also, antidepressants appear to help with her depression. This factor would weigh against her credibility on the question of her disability.

The court finds that the ALJ correctly applied some, but not all, of the standards set out in *Polaski* to determine credibility. Because the ALJ's analysis of Hovenga's credibility was, at least in part, flawed, a remand is appropriate for a more complete consideration and analysis of Hovenga's credibility.

Hovenga also argues the ALJ did not give proper weight to the opinions of her treating medical care providers. This argument, for the most part, focuses on the ALJ's determination to give almost no weight to the opinions of long-time treating Physician's Assistant Matt Sowle. The ALJ pointed out that a physician's assistant "is a non-acceptable medical source whose opinions may be considered as to severity of impairments and how they affect the claimant's ability to function, but may not offer diagnoses or medical source statements binding on the commissioner." R. 69.

In *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003), the Eighth Circuit Court of Appeals revisited the question of the weight to be afforded the opinions of medical professionals, other than doctors, who have a treating relationship with a claimant. The court reiterated that the opinions of treating medical sources, including "other" sources such as physicians' assistants, generally are given more weight than non-treating, non-examining sources. *Id.*, 328 F.3d at 426-27 (citing 20 C.F.R. §§ 404.1513(d)(1), 404.1527(d)). In *Shontos*, the Eighth Circuit held, "A treating source's opinion is to be

given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record." *Shontos*, 328 F.3d at 426 (citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ gave several reasons for disregarding Sowle's opinions. She noted that in March 2008, Sowle completed a fibromyalgia residual function questionnaire stating that Hovenga had fibromyalgia and her prognosis was poor. The ALJ pointed out that there were no clinical or laboratory findings in the record indicating Hovenga has ever been diagnosed with or treated for fibromyalgia. Also in March 2008, Sowle completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" on which, according to the ALJ, he answered in the extreme all questions regarding Hovenga's impairments and her inability to work. The ALJ found that "[t]hese answers were so extreme as to appear implausible and were not supported by the medical evidence of record, nor by the claimant's admitted work activity and activities of daily living." R. 68. While some of Sowle's findings are supported in the medical record, many are not. For example, Sowle concluded that Hovenga was not a candidate for back surgery because of her cardiac history, an opinion which, as the ALJ noted, was not supported by any clinical evidence. Other opinions advanced by Sowle appear to be contradicted by his own treatment notes.

The ALJ speculated that Sowle may have advanced opinions favorable to Hovenga because he sympathized with her or because Hovenga may have been insistent and demanding in seeking supportive notes or reports. While it may have been inappropriate for the ALJ to speculate without evidence on possible motives for Sowle to express opinions favorable to Hovenga, the ALJ advanced other adequate reasons for discounting his opinions. The ALJ was justified in giving Sowle's opinions little weight.

Hovenga also argues the Appeals Council erred in not consider the "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form prepared by

Dr. Fagre on April 22, 2009. Doc. Nos. 10 & 15. According to an affidavit attached to Hovenga's brief (Doc. No. 10-1, at 1), this document was submitted to the Appeals Council on April 23, 2009. The transmittal letter states the form was "an assessment from her Treating Physician." Doc. No. 10-1, at 2. On the form, Dr. Fagre stated that Hovenga has a number of serious impairments resulting from heart, coronary artery bypass grafts, degenerative back disease, and peripheral vascular disease. He also concluded that she is unable to sustain a six- to eight-hour workday because of severe pain and fatigue. The defendant denies that the letter or report were ever received by the Appeals Council.

Title 20 C.F.R. section 404.970(b) provides: "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." The ALJ's decision was issued January 30, 2009, while Dr. Fagre's report was not prepared until April 22, 2009, so arguably, the Appeals Council was correct in not considering the report. On its face, it does not necessarily "relate[] to the period on or before the date of the administrative law judge hearing decision." However, it is unclear whether the report described Hovenga's condition as of the date of the report, or whether it also applied to some period of time before January 30, 2009.[4] Also, to the extent the Dr. Fagre concludes that Hovenga is disabled because of her heart and coronary issues, his conclusion is inconsistent with her last medical examination, on March 1, 2008, when

---

[4]In fact, although in her brief Hovenga describes Dr. Fagre as her treating physician, this fact is not established in the record. Also, there is nothing in the record to show the medical evidence Dr. Fagre relied upon in reaching his conclusions.

Dr. Rose observed that Hovenga "had essentially no chest pain, she ha[d] stopped smoking, and she look[ed] terrific." R. 628-30.

In any event, in the Eighth Circuit, it seems that a report submitted to the Appeals Council after the ALJ decision should be considered by the Appeals Council as part of the administrative record even if the report is prepared after the ALJ decision. *See Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992) (sleep apnea study prepared after the ALJ decision and submitted to Appeals Council was part of the administrative record). Because the court has found this case should be remanded, Hovenga will be able to provide details concerning the report, and the Commissioner will be able to evaluate and weigh the report as part of the record.

Hovenga next argues the hypothetical questions asked of the VE were incomplete because the ALJ failed to include Hovenga's mental impairments in the questions. Thus, she argues, the VE's responses to the questions cannot serve as substantial evidence to support the ALJ's decision. None of the hypothetical questions included any mental health impairments, presumably because the ALJ found them to be nonsevere. This finding is somewhat inconsistent with the report submitted by Dr. Johnson, in which he assigned Hovenga a GAF of 45. On the other hand, aside from this report, there is no strong evidence in the record, other than her own testimony, to support a claim that Hovenga is suffering from any severe psychological impairments. In any event, at the ALJ hearing, the hypothetical questions were garbled and confusing. They should be re-asked on remand.

Because a full and complete credibility analysis is lacking, the court finds it would be appropriate to remand the case for further proceedings, including any necessary development of the record regarding Hovenga's work-related mental and physical limitations. Among other things, it appears likely that additional vocational expert testimony will be required to consider a hypothetical question that mirrors Hovenga's

limitations. *See Hutton v. Apfel*, 175 F.3d 651, 656 (9th Cir. 1999) (A "proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant.").

Accordingly, the Commissioner's decision is hereby **reversed** and this case is **remanded** for further proceedings consistent with the above opinion.

**IT IS SO ORDERED.**

**DATED** this 7th day of June, 2010.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT